Metropolitan Convoy Corporation, a corporation of the Commonwealth of Pennsylvania, Plaintiff, v. Chrysler Corporation, a corporation of the State of Delaware, Defendant.

(*September* 1, 1961.)

Lynch, J., sitting.

*Ernest S. Wilson, Jr.*, for Plaintiff.

*Richard F. Corroon* (of Berl, Potter and Anderson) and *Keith A. Jenkins* (of the Detroit, Michigan, Bar) on the brief, for Defendant.

Superior Court for New Castle County, No. 738, Civil Action, 1959.

LYNCH, J.:

The complaint, as filed, alleged four causes of action. We are not concerned with the first three causes of action.

The Fourth Cause of Action alleged that Chrysler Corporation tortiously interfered with certain contractual relations said to have existed between plaintiff and Great Lakes Forwarding Company[1], looking to a merger of Plaintiff and Great Lakes, or a possible sale of assets by Great Lakes to Metropolitan. The complaint charged the existence of an agreement between Great Lakes and Metropolitan which, because of Chrysler's tortious interference, Great Lakes breached. Plaintiff sought damages in the amount of $400,000 for this alleged tort.

After a preliminary and exploratory oral argument, at which it became apparent that plaintiff's arguments were not limited to an alleged interference by Chrysler with the alleged contractual relations between Metropolitan and Great Lakes, plaintiff filed an amendment to its complaint, alleging a Fifth Cause of Action. In this Fifth Cause of Action Metropolitan alleged that from September to December of 1956, it "engaged in negotiations for the purchase of or merger with" Great Lakes; that Metropolitan "had * * * reasonable economic expectancy that * * * the negotiations would result in plaintiff's purchase of or merger with" Great Lakes, to a profit of $400,000; it was further alleged that certain officials of Chrysler induced "one Alvin McEvoy to tortiously inter-

---

[1]This company will be referred to as Great Lakes throughout this opinion. Plaintiff will be referred to as Metropolitan and defendant as Chrysler.

fere with plaintiff's reasonable economic expectancies" in its negotiations with Great Lakes, and "as a result of defendant's [Chrysler] tortious interference" McEvoy "purchased" Great Lakes "and damaged Metropolitan's reasonable economic expectancy * * *'" to either merge with or purchase Great Lakes.

Chrysler answered plaintiff's Fourth Cause of Action by alleging that it "is without knowledge or information sufficient to form a belief" and so denied the allegations set up in the complaint as the Fourth Cause of Action. Chrysler's answer to the Fifth Cause of Action was the same.

Chrysler moved for summary judgment on these two causes of action on the ground that with respect to such causes of action there is no genuine issue as to any material fact and that it was entitled to judgment as a matter of law.

Both sides engaged in lengthy and exhaustive discovery, and after a careful study of the affidavits, depositions, the exhibits thereto, answers to interrogatories, the briefs, and positions advanced in the oral argument, I am now ready to dispose of Chrysler's motion for summary judgment. I propose to set out what I will term Uncontroverted Facts in lieu of Findings of Fact, such as are made after a trial of a cause, as determined from the record before me.

### Uncontroverted Facts

I. (a) Metropolitan was engaged in the business of hauling new automobiles by the "truckaway" method from and to various parts of the United States, pursuant to Certificates of Convenience and Necessity issued by the Interstate Commerce Commission.

(b) Metropolitan at one time, and as recently as 1957, hauled Chrysler products from Detroit and Newark, Delaware, to destination points in the northeastern part of the United States.

II. Great Lakes was likewise a truckaway carrier; hauling Chrysler products was its principal business to given points within several parts of the United States.

III. (a) Chrysler for many years had as many as 83 truckaway carriers serving it in the transportation of its finished products, such as trucks and automobiles, from its assembly plants to its franchised dealers.

(b) On the other hand, Chrysler's competitors had as few as 4, 5, or 6 carriers hauling their products. Chrysler executives in charge of traffic thought that Chrysler had too many carriers and prior to 1957 a study of the problem had begun, referred to as "carrier retention program" with its objective,— to cut down the number of carriers.

(c) Chrysler's so-called "carrier retention program" was presented to its Administrative Committee sometime in the Spring of 1957. On May 17, 1957 a meeting of the carriers who hauled Chrysler products was held in Detroit. At that meeting Chrysler representatives explained the "carrier retention program". It was adopted because of the inability of Chrysler carriers to handle the distribution of traffic to Chrysler's satisfaction.

(d) Chrysler's "carrier retention program" involved the consolidation of various carriers and would result in fewer and bigger carriers serving Chrysler.

(e) Newberg[2], as a member of Chrysler's Administrative Committee, participated in the decision to adopt the "carrier retention program", but when the program was presented to the Committee, it did not include the names of carriers who would or would not be retained. Until about the time the final decisions were announced, Newberg did not know the names of the retained carriers. Until his first deposition was

---

[2]He is identified in detail, *infra,* page 621 *et seq.*

taken on February 11, 1960, except for one meeting in late 1957 or early 1958, when he merely spoke to a Metropolitan representative, Newberg never had an occasion to consider the situation of Metropolitan under the "carrier retention program." He had nothing to do with the decision to retain Great Lakes as a carrier. He knew nothing about Great Lakes, so he could not have advised McEvoy whether he should acquire it.

(f) A principal effect of the "carrier retention program" was to reduce the number of carriers hauling Chrysler products. Chrysler ultimately would end up with about 20, instead of 83, carriers.

IV. Metropolitan and Great Lakes had engaged in merger negotiations prior to 1956 but with no resulting agreement.

V. During 1956 it was apparently generally known in the industry that Chrysler planned to effect a reduction in the number of carriers serving it.

VI. In light of this information, conversations were again held during the last four months of 1956 and continuing in early 1957, looking to a purchase of or merger between Metropolitan and Great Lakes. Metropolitan and Great Lakes, by and through their representatives, had a number of meetings in New York through the last four months of 1956.

VII. Jack Troy and his son, Melvin, President and Secretary-Treasurer of Metropolitan, together with Frank Heiss and George Duff, acted for and represented Metropolitan in and during these negotiations.

VIII. Thomas P. Geddes, President of Great Lakes, George Mason, its attorney, and Abraham Cornfield (Jack Troy's son-in-law) acted for and represented Great Lakes in these negotiations.

IX. Howard Connelly, Chrysler's former Traffic Director, participated in at least one of the negotiation meetings; but

his participation is less than clear. Except for that, no Chrysler representative participated in the negotiations between Great Lakes and Metropolitan. Mr. Connelly may have indicated that he would favor a merger of the two companies. No Chrysler representative ever indicated a disfavor to a merger or a combination of Great Lakes and Metropolitan or even tried to interfere with the negotiations.

X. Metropolitan contends that at a meeting held in December of 1956 in the office of Great Lakes' attorneys, a deal was concluded whereby Metropolitan agreed to purchase Great Lakes for the book value of Great Lakes plus $100,000. In addition, Geddes, the owner of Great Lakes, was to be kept on the payroll of the merged corporation at a rate of $24,000 per year. Thereafter it was left to the lawyers to get together to draft the final agreement.

XI. Metropolitan's lawyer sent Great Lakes' lawyer a draft of the proposed agreement and after reviewing it Great Lakes' lawyer found that the draft of agreement was far from "any transaction of the type * * * contemplated" and Metropolitan's lawyer agreed that the draft of the proposed written agreement was not in accordance with the discussions had at the December 1956 conference.

XII. (a) Great Lakes' lawyer revised the draft of agreement and sent it to Geddes, Great Lakes' President.

(b) Geddes, on March 4, 1957, advised Great Lakes' lawyer that he had "little heart in attempting to further proceed in this matter at all * * *. A major consideration for me at this point, while it cannot be expressed fully, is that if we have to take such a buffeting during this initial period or 'honeymoon', I am very much afraid that the marriage would be insufferable * * *. I must point out that if [the last draft is] submitted to [Metropolitan] it must be done with qualification since I feel that some of the features are not practical, or for other reasons, unacceptable."

(c) Geddes concluded on March 4, 1957, it would be impossible to reach an agreement with Metropolitan.

(d) During the week following Easter of 1957 (Easter fell on April 21, 1957) Geddes visited Jack Troy in Florida and told him the deal was off. "Somebody else wants to purchase the business" for cash but Geddes did not tell Troy the prospective purchaser was Alvin McEvoy, the ultimate purchaser.

(e) Troy indicated to Geddes it would be impossible for him to make a deal on such a basis.

(f) During the course of the conversation in Florida, Troy asked Geddes how much the negotiations between Metropolitan and Great Lakes had cost him in legal fees. Geddes told him that his legal bill had been $4,000. Troy replied that he had only paid $3,000 and he was quite gleeful that Metropolitan's fee was less than Great Lakes.

(g) From this and Geddes' statement to Troy he had a buyer for Great Lakes on a cash basis, I infer that Troy accepted the fact that the negotiations for a purchase or merger between the companies were at an end.

XIII. Alvin McEvoy had become interested in buying Great Lakes early in March of 1957—this was never made known to Jack Troy. Early in 1957 McEvoy visited William Newberg at Chrysler, who was then a group Vice-President at Chrysler. He subsequently became Executive Vice-President, and then was elected President of Chrysler. McEvoy called Newberg because Newberg was the only member of the Chrysler organization whom McEvoy knew well enough to call concerning information relating to Great Lakes before proceeding with further negotiations with Geddes.

XIV. McEvoy first called Geddes for an appointment at the suggestion of Roy Van Beckum, President of Commercial Carriers, engaged exclusively in the automobile hauling

business. McEvoy had known Van Beckum for thirty years and McEvoy had told him sometime in the early part of 1957 that he would like to acquire an automobile transport company. Van Beckum called McEvoy early in March and at a luncheon meeting told him that Geddes' health was not good and that Geddes was apparently anxious to sell Great Lakes.

XV. McEvoy, at the time of his discussions with Newberg and Laughna, was in charge of fleet sales for the General Motor Truck and Coach Division.

XVI. When McEvoy called on Newberg, Newberg introduced McEvoy to Robert Laughna. Newberg was Laughna's immediate superior at Chrysler, and in charge of the traffic program. Newberg stated to Laughna that McEvoy was "a good business man". Newberg told Laughna that McEvoy was "thinking of getting into the trucking business" and that he "wanted to discuss with somebody that was in charge of traffic * * * particularly the carrier that * * *" he "was interested in buying, finding out what its standing was with Chrysler and whether or not they felt that * * *" he " would be a suitable operator of the company and so on."

XVII. Laughna concluded, after some twenty minutes of conversation with McEvoy, and upon Newberg's recommendation, that McEvoy "could offer * * * the type of business administration and customer relationship between the customer and the corporation that [Chrysler] desired" but provided McEvoy managed Great Lakes and continued to give Chrysler the same service that had previously been given by Great Lakes. Laughna advised McEvoy that he would have to eliminate all connection with General Motors and that Chrysler would not look with favor on absentee management of Great Lakes.

XVIII. Prior to Laughna's meeting with McEvoy in Newberg's office Laughna had had a conversation with Geddes, at which Geddes told Laughna that he was interested in

making a deal with McEvoy. Laughna did not know McEvoy and said he would like to meet him.

XIX. McEvoy did not ask Laughna whether Great Lakes was to be a retained carrier under Chrysler's "carrier retention program".

XX. (a) Geddes and McEvoy reached an understanding as to terms and purchase price, but the posture of negotiations, prior to May 17, 1957, was such that McEvoy could have called the deal off if he had wanted to. Even during April of that year these negotiations had "reached a point * * * where is was possible to start making drafts of the proposed agreement".

(b) Sometime in May of 1957 a firm agreement was reached. McEvoy did not know at that time whether Great Lakes would be a retained carrier. He testified that the fact made less difference to him at that time than it would have when he gave his deposition and again emphasized that Geddes "had a very firm belief that Great Lakes would have been part of a consolidation in the event that they were not selected specifically to be a retention carrier".

XXI. The transaction between McEvoy and Geddes was not formalized prior to May 17, 1957, when Chrysler announced the completion of the "carrier retention program", although it is clear from both the Geddes and the McEvoy depositions that they had reached an agreement as to terms and purchase price.

XXII. Metropolitan contends (answer to Chrysler's Interrogatory No. 33) that Chrysler's alleged tortious interference in and with the contractual relations between Great Lakes and Metropolitan consisted of "communicating to the negotiating parties, excluding [Metropolitan], advance information on the identity of retained carriers".

XXIII. The record does not show any facts showing obvious effort on Chrysler's part or from which I can infer that any Chrysler representative endeavored to interfere, in any degree, with the negotiations that took place between Metropolitan and Great Lakes, looking to the purchase by Metropolitan of Great Lakes or a merger of and between such companies.

XXIV. Metropolitan make no inquiry at any time of Chrysler as to the progress of the Chrysler "carrier retention program", and if it would be a retained carrier.

XXV. Chrysler gave no information, and particularly no misinformation, to Metropolitan as to progress of Chrysler's "carrier retention program" and whether it would be a retained carrier.

XXVI. Chrysler did not tell McEvoy, prior to the May 17, 1957 meeting, that Great Lakes was to be a retained carrier, although Geddes had, prior to the May 17th meeting, received general reassurances that Great Lakes' standing was good, that Great Lakes would be a retained carrier, or would have an opportunity of joining with a carrier who was. Members of Chrysler's Traffic Division gave such general reassurances. At the May 17th meeting when Chrysler announced the standards on which it would be determined which carriers would be retained, Geddes "was certain * * * that our standing was all right". Geddes was not told until after the May 17th meeting that Great Lakes was to be a retained carrier.

XXVII. Geddes indicated to McEvoy that he had no idea of just what the final phase of Chrysler's "carrier retention program" would be, but he never suggested that Great Lakes would be eliminated completely. During his negotiations with Geddes, McEvoy did not attach too much importance to the "carrier retention program" because of his lack of familiarity with it. Geddes did not contemplate the possibility

that Great Lakes would be eliminated as a carrier completely until Chrysler personnel had explained the program to him. Subsequent to the Newberg-Laughna-McEvoy meetings Geddes reported some further discussions on the subject and conversations that he (Geddes) had "currently with members of the Chrysler Traffic Department, people whose names [McEvoy is] not familiar with, but who apparently had given Geddes assurances that the carrier program involved more than just a reduction in the number of carriers, that it contemplated consolidation of companies with a view of making fewer and bigger and stronger companies and that as far as * * * Geddes, was concerned, that he felt confident that Great Lakes' future was assured in one form or another". McEvoy's friend, Van Beckum, confirmed that the program contemplated consolidations.

XXVIII. The Geddes-McEvoy transaction was finally consummated in mid-June 1957, shortly after McEvoy had been told by Chrysler representatives that Great Lakes was to be a retained carrier. When Geddes was so informed, he was advised that "Chrysler as a matter of policy would expect those carriers who remained in the program to provide adequately to take care of Chrysler's needs and that they expected that would be done through either purchase of equipment or merger of companies and that there probably would be some additional information in that connection coming forth at a later date".

XXIX. McEvoy first heard that Great Lakes would be a retained carrier at a meeting with Chrysler representatives held in June, shortly before the Geddes-McEvoy transaction was consummated.

XXX. It was not until after the May 17, 1957 meeting that it was decided which eastern carriers (Metropolitan was not in the group) would be retained.

XXXI. Chrysler's decision to drop Metropolitan as a carrier was made subsequent to the May 17, 1957 meeting.

XXXII. Metropolitan was advised within two or three weeks after the May 17th meeting that it would not be retained as a Chrysler carrier.

XXXIII. Within a week or two after the Geddes-McEvoy transaction was completed, a Chrysler representative called McEvoy and told him that Mr. Troy was in town and that he was at the Sheraton-Cadillac Hotel. McEvoy was given his room number and was asked to call and it was suggested that he attempt to work out plans for merging the companies or purchase of equipment, or whatever could evolve from transactions of that kind.

XXXIV. McEvoy did purchase Great Lakes from Geddes; McEvoy did not take over Great Lakes until June of 1957.

In light of the Uncontroverted Facts stated above this opinion could be closed at this point, since I find there is no genuine issue of any material fact. I think, however, some consideration should be given to some phases of the record that the parties produced before me, and comment made in order that the record show that all phases of the case have been given consideration and determination made of some of the contentions urged by the parties.

The parties were aware of the Rule of this Court, which requires parties opposing a motion for summary judgment to come forward with evidence admissible in form which shows the existence of a genuine issue of material fact. *Frank C. Sparks Co. v. Huber Baking Co., Del. Sup.* 1953, 9 *Terry* 9, 96 *A.* 2d 456; *G. M. S. Realty Corp. v. Girard Fire & Marine Ins. Co., Del. Super.* 1952, 8 *Terry* 216, 89 *A.* 2d 857; *Colish v. Brandywine Raceway Ass'n, Del. Super.* 1955, 10 *Terry* 493, 119 *A.* 2d 887; and *Woodcock v. Udell, Del. Super.* 1953, 9

*Terry* 69, 97 *A.* 2d 878. Hence it has been assumed that the parties to this action have produced all the evidence available to them which would in any wise tend to prove or disprove the issues raised. I have determined what I regard as the material Uncontroverted Facts on the assumption there has been full compliance with the principle, and if I have erred in any wise it is because one or the other of the parties has overlooked or withheld some testimony which might make a difference.

The complaint alleged that there was a written agreement between Metropolitan and Great Lakes. In answer to Interrogatory No. 31, propounded by Chrysler to Metropolitan, Metropolitan stated that a written contract between these companies resulted from the negotiations held December 24, 1956 and that the written agreement was in Metropolitan's possession. By Supplemental Interrogatory No. 44, Metropolitan conceded, however, it did not have "possession, custody or control" of any written agreement between the parties, and in the course of oral argument, Metropolitan's attorney stated (page 46) that it "relies on no written argreements". It is clear from the depositions and the oral argument that the draft of the proposed agreement, prepared by Great Lakes' lawyer, Mason, and sent to Geddes (of Great Lakes), was never sent by Geddes to Metropolitan so it never was considered as an agreement.

From the evidence presented I could not determine that Metropolitan and Great Lakes ever reached a firm, oral understanding or agreement, complete as to terms; it seems possible they might have orally agreed to enter into a written agreement but such a written agreement was never effectuated. When Mr. Geddes saw Jack Troy in Florida in April of 1957 and advised him there was somebody else interested in acquiring Great Lakes, it appears to me that Mr. Troy accepted this statement, and indicated he could not meet the terms of this other person. I consider, therefore, that there

was an abandonment by Troy and Geddes of such rights, as they may have had, to enter into a written agreement. It was for these reasons that I reached the determination that there never was any agreement—either written or oral—between Metropolitan and Great Lakes.

Whatever rights that Metropolitan could assert then must be based on a theory of economic opportunities or expectancies as involved Great Lakes with which Chrysler allegedly interfered. I am not convinced there was any interference by Chrysler of Metropolitan's economic opportunities or expectancies to deal with Great Lakes, either as to a hoped for merger agreement or for a purchase agreement.

Metropolitan argued that Laughna, of Chrysler, was the Chrysler representative who was the "malefactor" and it was he who, on behalf of Chrysler, allegedly interfered with Metropolitan's economic opportunity or expectancy involving Great Lakes. Careful consideration of the facts presented for my consideration does not support Metropolitan's factual thesis on this facet of the case. No facts were produced which showed or which could be the basis for any interference that Laughna, for Chrysler, interfered with Metropolitan's economic opportunity or expectation involving Great Lakes.

At one stage, in my consideration of the case, I had determined to assume interference on Chrysler's part with respect to such economic opportunity or expectation, but on reconsideration of and rereading the entire record I eventually was forced to conclude there was not the slightest basis to reach a determination that anyone in Chrysler had acted in a manner which could be said to have interfered with Metropolitan's economic opportunity or expectancy to merge with or purchase Great Lakes. There is nothing in the record on which I could find support for any determination I could make of any such interference on Chrysler's part.

It was agreed at oral argument (page 16) that Chrysler had done nothing to interfere with Metropolitan's negotiations up to March of 1957; and it was conceded (page 14) that the negotiations were concluded at the Easter week 1957 meeting between Geddes and Jack Troy. Prior to that time McEvoy had commenced his negotiations with Geddes for the acquisition or control of Great Lakes. Troy was advised someone else was interested in acquiring Great Lakes but not furnished with McEvoy's name, but I cannot regard that as determinative. Troy knew someone was ready to give Geddes more than Metropolitan had offered, and apparently Troy chose to do nothing to meet McEvoy's offer.

Nothing appears in the record to show what McEvoy said to Laughna or what Laughna said to McEvoy when they met and conferred. There is nothing in the record showing or from which I can infer that conversations between Laughna and McEvoy took place in an atmosphere of evil, so far as Metropolitan was concerned. I think it is right for me to assume and determine that Laughna was interested in getting the best men in the operation of Chrysler's "carrier retention program"; Laughna's apparent approval of McEvoy's desire to acquire control of Great Lakes cannot be shown to have been inspired by any hope of personal profit to Laughna or perhaps even Newberg. Laughna's decisions seem to have been guided by what he thought was best for Chrysler; neither he nor Chrysler can or should be questioned as to such a decision.

The Court was asked to draw an inference or inferences as to what transpired between Laughna and McEvoy because (page 19 of notes of oral argument) "No one in their right mind would lay out the sort of money that McEvoy told us he laid out for Great Lakes if he entertained any doubt at all that Great Lakes was going to be a retained carrier". It is sufficient for me to emphasize Chrysler could go far in deciding which were to be the retained carriers, and unless Metropolitan could show some "double dealing" on Laughna's

part I can see no reason he should not have stated that Great Lakes was to be a "retained carrier".

What did Jack Troy do after Geddes told him someone else was interested in acquiring Great Lakes? Nothing. Did he ask Chrysler if Great Lakes was to be a retained carrier? No. Did Chrysler misinform Troy or in any wise deceive him as to what Chrysler proposed to do about Great Lakes? No. Was it not within Chrysler's province to get the kind of persons interested in the transportation of their finished product, as Chrysler wanted? Yes. Couldn't Chrysler choose the carriers it wanted to retain and dispense with the services of the others? Yes. What duty did Chrysler owe to Metropolitan not to tell McEvoy or Geddes Great Lakes was to be a retained carrier, if that was true? None. What was Chrysler's duty to Metropolitan so far as it involved advising that company of the decision not to retain it as a retained carrier? None. Did any Chrysler official violate any statute or regulation or accept a bribe or otherwise act in any culpable manner in deciding to retain Great Lakes as a "retained carrier"? No. All this being so, what duty owing to Metropolitan did Chrysler breach in selecting Great Lakes as a retained carrier and letting such decision be known? What, if any duty, did Chrysler owe Metropolitan not to choose that company as a retained carrier?

In my opinion Chrysler owed Metropolitan no duty whatsoever so far as selecting Great Lakes as a retained carrier, and letting that fact be known, and not choosing Metropolitan.

Under the theory of these Causes of Action, and the facts presented thereunder, Chrysler had an unlimited privilege to choose the carriers it wanted to retain to do the work and accomplish the objects Chrysler thought were in its interests; it was within Chrysler's unlimited province— short of fraud, deception, malice or other legal misconduct, such as bribery of

officials—to make its own business judgments and to retain those carriers it thought would best serve it. Those not selected would have no cause of action against Chrysler unless they could show a violation of any contractual rights theretofore existent.

The record before me shows that what Chrysler did was a pure business decision; it was the choice as to whether Chrysler wanted to retain Great Lakes and not retain Metropolitan; if it could make that choice I see no reason why Geddes or McEvoy should not be told Great Lakes was to be a retained carrier. Jack Troy could have, after the Geddes *conversation* in Florida, sought to protect Metropolitan's interest by inquiring of Chrysler if Great Lakes was to be a retained carrier and then make another offer if *circumstances* justified; he did not choose to do so.

There is nothing presented by way of statute, legal regulations or case law—even the general principles of *Lumley v. Gye*—that enters into and can affect Chrysler's decisions in the effectuation of its own business objectives, having in mind what it wanted to achieve in the "carrier retention program". Chrysler was in a position to exercise its judgment in the formulation of its "carrier retention program"; it was up to Chrysler to decide which carriers were or were not to be retained.

Courts do not, cannot and should not undertake to sit in judgment on the business decisions or judgments of companies in matters of the conduct of their business, unless there is a transgression of law or violation of a statute or other legal misconduct. I find none here in the record before me. I cannot and no not accept the so-called "economic expectancy" theory relied on by Metropolitan as applicable here.

It is, therefore, unnecessary for me to give further consideration to the authorities cited by Metropolitan which may

give legal significance to the various factual theories urged by plaintiff.

An order may be submitted granting defendant's motion for summary judgment addressed to plaintiff's Fourth and Fifth Causes of Action and directing they be dismissed.