72 N.J. Super. 596 (1962)
179 A.2d 86
PAUL JOYCE, PLAINTIFF,
v.
JOHN E. STAFFORD AND HELEN R. STAFFORD, DEFENDANTS.
Superior Court of New Jersey, Camden County Court, Law Division.
Decided February 23, 1962.
*597 Mr. John F. Lake for plaintiff (Messrs. Aiken and Lake, attorneys).
Mr. E. Milton Hannold for defendants (Messrs. Hannold & Hannold, attorneys).
R. COOPER BROWN, J.C.C.
This suit was instituted by Paul Joyce, as plaintiff, who is a licensed real estate broker of New Jersey, against John E. Stafford and Helen R. Stafford, his wife, owners of certain land located partly in the Boroughs of Stratford and Hi-Nella, and partly in the Township of Gloucester, Camden County, New Jersey. Plaintiff alleges that defendants owe him the sum of $11,095.03, for unpaid real estate commissions.
The facts are briefly as follows: Defendants owned a farm, located in parts of all three of the above municipalities, consisting of approximately 370.95 acres. On July 27, 1955 plaintiff negotiated with defendants for the right to act as their agent or broker in the sale of the land to one Rae Crowther, and an agreement was executed by defendants wherein they agreed that
"* * * in the event Mr. Crowther purchases all of our farm or any portion thereof, that we will pay Paul Joyce a sales commission of five (5%) per cent of the gross amount of money received, as received, under the terms of the Agreement, except money paid us for the lands to be given to the School Board of the Borough of Stratford.
*598 This agreement applies only to any negotiations made with the said Rae Crowther or his representatives, and does not give Paul Joyce the exclusive rights to sell our farm."
It is agreed that at the time of the execution of the aforementioned commission agreement Mr. Crowther was about ready to purchase the land, and two days later, on July 29, 1955, he executed an agreement with defendants to buy the said property for a price of $2,500 per acre. The total sales price was to be predicated on the number of acres to be determined from an accurate survey, to be supplied by the buyer, under conditions set forth in the agreement. It is admitted that Mr. Joyce was fully conversant with the terms of the agreement of sale and that he witnessed the execution thereof by the parties and also took the acknowledgments of both the buyer and the seller. Crowther made a down-payment of $10,000 at the time of the signing of the agreement, which was to be held in escrow by the West Jersey Title & Guaranty Company until the survey was procured and the site was approved by the Federal Housing Administration and Veterans Administration for use of the property as a one-family development, and in the event that such approval was not forthcoming, due to no fault of the purchaser, then the agreement would be extended to secure such approval, or if such approval could not be obtained, the purchaser had the right, upon written notice, to a return of the deposit.
However, upon the approval of the Federal Housing Administration and the Veterans Administration, which was thereafter obtained, the buyer agreed to immediately submit all necessary site plans, sketches, plats and building plans and specifications as may be necessary and proper to secure the required permits from local, county and state agencies. Settlement was to be held within 30 days after securing said approval, and at the time of settlement the buyer would deposit an additional sum of $12,500 to be applied on account of the purchase price. The agreement further provided that upon the closing of title and transfer of the *599 fee to the buyer, the buyer should also pay an additional sum of $202,500, and that the balance then remaining was to be secured by a purchase money mortgage, without interest, due and payable three years from the date of the settlement. At the time of the settlement the owner was to release from the lien of the mortgage 90 acres of said land without further payment, and thereafter release from the lien of said mortgage such acreage as the buyer may require upon the payment of $2,544 per acre.
The buyer agreed to convey to the Borough of Stratford, for school purposes, ten acres out of the tract, and upon making said conveyance was to get a further credit of $12,500. The agreement provided that the same might be assigned by the buyer at his option.
Crowther's interest was transferred to the Laurel Mills Development Co., a corporation in which he was interested, prior to date of settlement, and at that time it was agreed that the survey indicated there were, by actual count, 370.95 acres. Thus the total consideration was fixed at $927,375.
A mortgage was given by the Laurel Mills Development Co. to the defendants for the sum of $675,357.72 on April 4, 1956, which was the date of settlement. On that date defendants received the gross sum of $252,017.28 and paid to Joyce $12,600.87 as his share of the commission on the actual gross cash received. Defendants have received the following gross sums and paid the following commissions:

 Date Amount Received Commissions Paid
April 4, 1956 ....................... $252,017.28 $12,600.87
December 20, 1957 ................... 151,546.08 7,577.30
November 26, 1958 ................... 50,880.00 2,544.00
December 4, 1959 .................... 127,836.00 6,391.80
January 13, 1960 .................... 123,155.04 6,157.75
 ___________ __________
 $705,434.40 $35,271.72

The aforesaid mortgage was to be paid within three years from the date thereof, without interest, as provided by the terms of the original agreement; however, on November 26, *600 1958 an extension agreement was executed by the Laurel Mills Development Co., and defendants extended the time for payment from April 4, 1959 to November 4, 1959. On December 4, 1959 a second extension agreement was made by Laurel Mills Development Co. and defendants, which extended the time for payment to January 11, 1960.
The testimony of Crowther was that during the year 1955 he negotiated for the purchase of the land with plaintiff and saw him about six or eight times. That he had his lawyer prepare the agreement of sale, and that plaintiff had explained to him that this was a "taking" agreement. That he could take only the ground he wanted; all of the good land or as much as he wanted. That he took title to the first land in his own name and then formed a corporation, Laurel Mills Development Co., to take title to the balance of the land and to make the mortgage. At the time of the execution of the second extension agreement, there remained approximately 190.76 acres still covered by the mortgage. Crowther, at that time, had estimated that 96.10 acres of this land was "area not practicable for development" and therefore did not wish to release this land from the mortgage at the agreed rate. He had a meeting with defendants some time in either late November or early December and told them that with respect to the remaining 190.76 acres, his company would either give them back a deed in cancellation of the mortgage or that they would pay for the 98.66 acres which were usable at the agreed release price, provided defendants also released the remaining marginal or unusable land, amounting to 92.10 acres. After considering the matter, defendants agreed that the 92.10 acres were not usable and that it would be wise to cancel the mortgage upon receiving payment for the 98.66 acres. This amounted to an additional $250,991.04. Part of this sum was received on December 4, 1959 and the balance on January 13, 1960, as set forth in the above schedule. Mr. Joyce was accordingly paid and accepted the commissions thereon. Without this final agreement between *601 Crowther and defendants, defendants would have had to take back the remaining land or foreclose the mortgage which was then about to go into default. If this had happened, Joyce would have lost commissions in excess of $12,000, which he finally received.
It should be noted, at this point, that the agreement of July 27, 1955 provided in the 17th paragraph thereof that "Any covenants, warranties, or agreements herein expressed shall be deemed to be incorporated into the entire transaction and to carry over an expression of the intent of the parties beyond the date of settlement and until the Mortgage is fully paid and satisfied." Joyce now claims that on January 13, 1960 there was a balance of $345,095.64 due on the mortgage, and that the defendants, without his knowledge or consent, accepted the sum of $123,155.04 in settlement thereof and thereafter caused or permitted the mortgage to be cancelled. He alleges that he is entitled to 5% commission on the amount which was forgiven by defendants of $221,940.60, or $11,095.03.
The right of a broker to collect a commission for the sale of real estate must be by a contract in writing under the statute of frauds. R.S. 25:1-9 provides in part as follows:
"Except as herein otherwise provided, no broker or real estate agent selling or exchanging real estate for or on account of the owner shall be entitled to any commission for such sale or exchange, unless his authority therefor is in writing, signed by the owner or his authorized agent, or unless such authority is recognized in a writing or memorandum, signed by the owner or his authorized agent, either before or after such sale or exchange has been effected, and, in either case, the rate of commission on the dollar or the amount of the commission shall have been stated therein."
The Appellate Division in the case of Todiss v. Garruto, 34 N.J. Super. 333 (1955), said that "In such a situation it is elementary that the right of the broker to the stipulated commission is measured by the pertinent terms of the contract of sale."
*602 The court in that case went on to say:
"It is the settled rule that in the absence of some qualifying or oppugnant expression, a broker who is duly engaged ordinarily earns his commission when he procures for the owner a purchaser ready, able, and willing to comply with the terms specified in the authority thus conferred, or with other or different terms which, however, are satisfactory to the owner. Marschalk v. Weber, 11 N.J. Super. 16, 21 (App. Div. 1950), certification denied 6 N.J. 569 (1951); Richard v. Falleti, 13 N.J. Super. 534 (App. Div. 1951); Alnor Construction Co. v. Herchet, supra [10 N.J. 246 (1952)] in all of which citations of the earlier decisions appear.
The aforementioned rule of law recognizes, however, that a broker may, by a special agreement with his principal, contract to fix definitely or to postpone the time of the payment of his commission or, indeed, conditionally make his compensation entirely dependent on a stated contingency. Hinds v. Henry, 36 N.J.L. 328 (Sup. Ct. 1873). Illustrative are the decisions discussed in Richard v. Falleti, supra."
In the present case we also have a special agreement between the vendors and the broker. By its terms the commission is to become due and payable at the rate of "five percent of the gross amount of money received, as received, under the terms of the Agreement." (Emphasis added.) The agreement referred to is the contemplated agreement of sale between defendants and Crowther.
This case differs somewhat from the Todiss case in that a settlement was held and deeds were delivered by the vendors. The vendee in turn delivered a purchase money mortgage for part of the consideration. The question now presents itself as to whether or not the acceptance of this mortgage or the later cancellation thereof, entitled the plaintiff to his commission on the full original sales price. It seems quite apparent that the parties either had the specific agreement of sale with Crowther in mind when the brokerage agreement was executed, or thoroughly contemplated its terms, for the language used is not that normally employed in a brokerage agreement. The acceptance of the mortgage certainly did not constitute the receipt of money and neither did it amount to payment in lieu *603 of money. Even the taking of a check or a promissory note on account of a debt does not, standing alone, constitute payment. The Supreme Court in the case of State v. United States Steel Corp., 12 N.J. 38 (1953) said:
"The common-law rule is that a check or promissory note, either of the debtor or a third person, received for a debt, is not payment if not itself paid, except in cases where it is positively agreed to be received as payment."
Having, as we do here, a promise to pay the brokerage commission upon a condition which never fully eventuated, we must now necessarily advance to the question of whether or not the act of the vendors in resorting to a compromise agreement of partial rescission of the original agreement, in its legal operation expunged the effectiveness of the contingent provision of the brokerage agreement.
As in the Todiss case, supra, we must infer that the vendee unjustifiably refused to complete the transaction with the defendant and insisted on a compromise settlement. As in Todiss:
"The principle of law is that the condition upon which the payment of the commission is contractually made to depend is rendered legally inoperative only where the vendors have indulged in some affirmative act to hinder or prevent the consummation of the contract of sale. This principle has the support of an abundance of judicial authority in numerous jurisdictions. The discordancy and divergency of opinion discoverable in the decisions are noticeably attributable to the contrastive and differential conceptions of the applicability of the principle to the circumstances of the given case in view of the terms of the brokerage contract. So here, the question on this feature of the case is whether amid the facts of the case the principle is to be influential in the determination of the issue.
Mere passive acquiescence in a declared default is not recognized as an act of prevention or hindrance. * * *
Obviously a new conciliatory bargain into which the grantors were not compelled to enter in the nature of a novation of obligations replaced the former contract. Whether without it the contract of sale might have been completed is purely conjectural, but apparent it is that in the actual circumstances the contract was mutually rescinded and its consummation abandoned by the voluntary compromise of the vendors and the vendee.
*604 We must not only appreciate the relevant significance of all of the aforementioned postulates, but we must also determine whether those circumstances extinguished, perhaps by means akin to waiver, the legal substantiality and effectiveness of the express condition precedent contained in the brokerage agreement. * * *
Assuredly the law disables a vendor from escaping liability to the broker by invoking the contingency clause where the non-performance of the contract of sale is attributable to the malfeasance or fraudulent, arbitrary, or capricious conduct of the vendors."
In the present case it is not evident that the announced refusal of the vendee to complete its agreement by the payment of the mortgage in full was in anywise induced by defendants, nor is it disclosed that the defendants and the vendee deceitfully contrived, through the medium of the compromise agreement, to defeat the claim of the broker. Upon the announced intention of the vendee to either breach the contract or to enforce a compromise, the vendors in reality occupied the situation of passive victims searching only for available salvage.
It is recognized that persons are at liberty to incorporate their own conditions and limitations in their contracts, subject only to the legality of the purpose and the considerations of public policy. The brokerage contract with which we are here concerned clearly manifests the definite intention of the parties that the commission was to be contingent. That contingency being that it was to be paid only on the gross amount of money received, as received, under the terms of the agreement of sale.
I must, therefore, conclude that the plaintiff has already been paid all the commissions to which he is lawfully entitled. A judgment in favor of the defendants of no cause for action will be entered.