Peter GILBERT, William Steiner, and Herbert Breitman, as sole Trustee of Ed Rosenthal Neckwear, Inc. Profit Sharing Plan, and all other parties similarly situated and circumstanced, Plaintiffs Below, Appellants,

v.

The EL PASO COMPANY, Travis H. Petty, Richard S. Morris, William V. Holick, Ben F. Love, L. Emery Katzenbach, Howard Boyd, John R. Hubbard, William D. Noel, Willard F. Rockwell, Jr., Kenneth Rush, Burlington Northern, Inc., a Delaware Corporation, Royal D. Alworth, Jr., Zane E. Barnes, Richard M. Bressler, Daniel P. Davison, Thomas E. Deacy, Walter A. Drexel, Mary Garst, Richard C. Grayson, Warren J. Hayford, Hutchinson Pemberton, Louis W. Menk, Thomas H. O'Leary, Paul L. Parker, Bruce M. Rockwell, Gerald C. Ryan, Elliot H. Stein and David R. Williams, Defendants Below, Appellees.

Supreme Court of Delaware.

Submitted: April 11, 1989.
Decided: May 16, 1990.

William Prickett and Vernon R. Proctor of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Mordecai Rosenfeld, New York City, of counsel, Abraham G. Levin, Martin A. Coleman (argued), Stephen A. Marshall and Serene K. Nakano of Rubin, Baum, Levin, Constant & Friedman, New York City, of counsel, for appellants.

Robert K. Payson and James F. Burnett of Potter, Anderson & Corroon, Wilmington, Howard W. Goldstein (argued), and Robert J. Gunther, Jr. of Mudge, Rose, Guthrie, Alexander & Ferdon, New York City, of counsel, for appellees El Paso.

A. Gilchrist Sparks, III and Lawrence A. Hammermesh of Morris, Nichols, Arsht & Tunnell, Wilmington, Marc P. Cherno (argued), and Terri L. Newman, of Fried, Frank, Harris, Shriver & Jacobson, New York City, of counsel, for appellees Burlington defendants.

Before MOORE, J., BIFFERATO and TAYLOR, Judges, (sitting by designation pursuant to Del. Const. art. IV, § 12).

MOORE, Justice.

In this consolidated class action, plaintiffs are stockholders of The El Paso Company ("El Paso"), who appeal from a 1984 Opinion and Order[1] ("*Gilbert I*") and a 1988 Memorandum Opinion and Order[2] ("*Gilbert II*") of the Court of Chancery. The suit arises from a December, 1982 tender offer ("the December offer") by co-defendants Burlington Northern, Inc. and R–H Holdings, Inc. (collectively, "Burlington") for 51.8% of the common stock of El Paso, the El Paso response to that offer, and a negotiated settlement which led to the termination of the December offer and the substitution of a new tender offer in January, 1983 ("the January offer").

Plaintiffs represent the class of El Paso shareholders who had tendered into the December offer, and contend that defendants El Paso and its directors destroyed plaintiffs' inchoate proration rights as a result of the settlement agreement terminating the December offer. Additionally, plaintiffs maintain that the settlement with Burlington was negotiated primarily to enable the El Paso directors to tender their own shares into the January offer, and that Burlington knowingly aided and abetted this breach of the El Paso directors' fiduciary duties to shareholders. Finally, plaintiffs contend that Burlington's directors improperly and knowingly breached a contractual obligation to complete the December offer, and that Burlington could not

---

1. *Gilbert v. The El Paso Co.*, Del.Ch., 490 A.2d 1050 (1984) (*Gilbert I*).

2. *Gilbert v. The El Paso Co.*, Del.Ch., C.A. Nos. 7075, 7078 & 7079, Jacobs, V.C., 1988 WL 124325 (Nov. 21, 1988) (*Gilbert II*).

interfere with plaintiffs' contract rights thereunder.

In *Gilbert I,* the Court of Chancery granted partial summary judgment to Burlington as to all allegations against it except for the conspiracy claim. Thereafter, in *Gilbert II* the trial court granted summary judgment to the defendants on all remaining claims, finding that under a traditional business judgment analysis the actions of El Paso's directors constituted a reasonable and proper response to the Burlington offer, and that defendants had not breached any fiduciary duties owed to the class plaintiffs.

We affirm the rulings in *Gilbert I* and reject plaintiffs' argument that Burlington improperly and impermissibly terminated the December offer. However, the legal analysis of *Gilbert II* is inconsistent with the principles and standards of *Unocal Corp. v. Mesa Petroleum Co.,* Del.Supr., 493 A.2d 946 (1985). The heightened scrutiny mandated by *Unocal* applies at the threshold of inquiry when, under the circumstances here, a board of directors opposes a hostile bid for control of a corporate enterprise. *See Paramount Communications, Inc. v. Time, Inc.,* Del.Supr., 571 A.2d 1140, Horsey, J. (1990); *Mills Acquisition Co. v. Macmillan, Inc.,* Del.Supr., 559 A.2d 1261, 1287 (1989); *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* Del. Supr., 506 A.2d 173, 180 (1986); *Unocal,* 493 A.2d at 954. *Gilbert II* ignored this basic legal standard.

We have nevertheless conducted our own legal analysis of the record and find that the Vice Chancellor's ultimate conclusions were correct. Thus, we conclude that El Paso's directors acted in good faith and on an informed basis. Accordingly, their ac-

tions were a reasonable response to the threat posed by Burlington's unsolicited and highly conditional December offer. Furthermore, there is nothing to support plaintiffs' claim that El Paso's directors arranged the termination of the December offer solely for the purpose of enabling the subsequent tender of their shares. The directors' actions in connection with the December and January offers meet the enhanced judicial scrutiny of *Unocal.* Thus, we affirm the judgments.

### I.

In 1982 El Paso, a Delaware corporation, was a diversified energy company principally engaged in the exploration, production and marketing of natural gas and oil products, with approximately 49,541,000 common shares issued and outstanding as of December, 1982.[3] At all times relevant here, El Paso's board consisted of ten members, seven of whom were outside, independent directors.[4] Burlington, also a Delaware corporation, is a publicly-held concern, principally involved in the transportation services and natural resource industries.

On the afternoon of December 20, 1982, Travis Petty, El Paso's chairman and chief executive officer, received a telephone call from Richard Bressler, the chairman and chief executive officer of Burlington. Bressler confirmed long-circulating rumors of Burlington's interest in acquiring El Paso,[5] and notified Petty that Burlington's board of directors had recently authorized him to initiate a tender offer to gain control of El Paso. The following day, December 21, 1982, Petty received a letter from Bressler confirming that Burlington had launched a tender offer for up to 25,100,-

---

**3.** El Paso's stock was publicly traded on the New York Stock Exchange. The last reported sales price prior to the announcement of Burlington's bid for the company (on December 20, 1982) was $18.25 per share.

**4.** The company's three "inside" directors were Travis H. Petty (President and Chief Executive Officer of El Paso), Richard S. Morris, (El Paso's Executive Vice President), and William J. Holick, Jr. (President of El Paso Natural Gas Company, an El Paso subsidiary).

Collectively, El Paso's ten directors held approximately 584,000 El Paso common shares, representing only slightly more than 1% of the total shares outstanding.

**5.** Nearly three months earlier, on September 24, 1982, the Dow Jones News Service reported that Burlington denied having any "imminent plans to buy" El Paso, and cited a Burlington spokesperson's claim that "[Burlington is] not making an offer."

000 common shares of El Paso, representing approximately 49.1% of the company's outstanding common stock. The ownership of these shares, when added to the 537,800 already beneficially owned by Burlington, would give Burlington control of over 51.8% of all outstanding El Paso common shares.[6]

The offer stipulated that tendered shares could be withdrawn until January 12, 1983, and that the offer would expire at 12:00 midnight on January 19, 1983. Burlington stated that if the December offer was oversubscribed, any shares tendered before December 30, 1982 would be entitled to proration rights.[7] Significantly, Burlington revealed no future plans to purchase the remaining 49% of El Paso's common shares upon completion of a fully-subscribed December offer. In fact, Burlington specifically cautioned that any future second-step transaction with El Paso's minority shareholders "might be on terms (including the consideration offered per share) the same as, or more or less favorable than, those of the [December] offer." Additionally, Burlington expressly reserved the right to terminate its highly-conditional offer upon the occurrence of any one of a number of specified events.[8]

El Paso's directors retained Merrill Lynch White Weld Capital Markets Group ("Merrill Lynch"), its regular investment bank, to advise the board on financial matters and to render an opinion on the adequacy of the December offer. Additionally, El Paso consulted its regular counsel, Mudge, Rose, Guthrie, Alexander & Fer-

don, and specially retained Wachtell, Lipton, Rosen & Katz ("Wachtell, Lipton") for legal advice concerning Burlington's bid.

The directors of El Paso met two days later at a special meeting on December 23, 1982, to consider Burlington's offer. El Paso's financial and legal advisers presented their evaluations of the December offer. During the meeting, representatives of Merrill Lynch advised the directors that the December offer was subject to certain complex, restrictive financing arrangements that could inhibit Burlington's ability to acquire the remaining 49% of El Paso's common shares in a second-step transaction or to otherwise subsequently increase a prospective investment in El Paso. Merrill Lynch also explained the dangers posed by such partial tender offers to the company's remaining shareholders, who would be vulnerable as minority shareholders in a Burlington-controlled corporation.

Merrill Lynch concluded that the December offer was both unfair and inadequate, and recommended that the board explore alternative transactions that might achieve greater value for El Paso's shareholders. Additionally, El Paso's management outlined the company's future financial and operational prospects, and predicted that the company was well-positioned to benefit from anticipated developments in the energy industry. Finally, representatives of Wachtell, Lipton explained the directors' fiduciary responsibilities to the company's shareholders in light of Burlington's bid, and reviewed the variety and consequences of defensive tactics available to El Paso.

6. If fully diluted (that is, upon the conversion of all outstanding El Paso convertible securities and employee stock options), Burlington would control 50.1% of El Paso's authorized common shares.

7. We have previously observed that granting such proration rights, in the absence of adequate protections for the company's remaining or back-end shares, has been universally recognized as a "classic coercive measure designed to stampede shareholders into tendering" their shares. *Unocal,* 493 A.2d at 956. This stratagem has primarily been criticized by us and has met a timely demise. *See id. See also* 17 C.F.R. § 240.14d–8 (1988).

8. Burlington reserved the right to terminate the offer if: (a) any legal action challenging the offer were instituted or threatened; (b) any governmental body took action which might affect or delay the offer; (c) there were substantial and material changes or threatened changes in the business or assets of El Paso; (d) El Paso authorized or proposed to authorize an extraordinary dividend or the creation of new capital stock; (e) El Paso adopted or proposed to adopt any amendments to its articles of incorporation or By-laws; or (f) El Paso and Burlington entered into a definitive agreement or understanding involving a business combination. Not surprisingly, each of these events occurred at some point during the course of this takeover contest.

Based in part upon these presentations, the El Paso board unanimously rejected Burlington's December offer, concluding that it was not in the best interests of the company or its shareholders. The directors were principally concerned with the perceived inadequacy of the $24 offering price, the partial nature of the bid, and the potentially adverse impact upon remaining shareholders if the December offer were successful. The directors also adopted several resolutions, upon the recommendation of legal counsel, designed to impede Burlington's bid. These measures included "golden parachute" employment agreements with El Paso's senior managers; amendments to El Paso's by-laws and Employee Savings and Stock Ownership plans; creation of a new series of preferred stock, with detachable share rights intended to forestall any business combination between El Paso and a 25% or greater shareholder without the approval of 90% of the outstanding preferred shares.[9]

In a letter dated December 23, 1982, the El Paso board informed the company's shareholders of these recent developments and expressly recommended that they not tender their shares into the December offer. Specifically, shareholders were advised that the board's decision to reject the December offer was based upon its belief: (i) that the $24 per share price of the offer was too low; (ii) that Burlington might encounter difficulty acquiring El Paso's remaining common stock on terms that would prove fair to the shareholders; (iii) that the value of stock of El Paso's remaining shareholders would be adversely affected by the completion of the offer; and (iv) that Burlington's restrictive financing arrangements would induce Burlington to engage in transactions that would not be in the best interests of the company's minority shareholders.[10] Moreover, the board advised El Paso's shareholders that it was committed to maximizing value "for all shareholders," and that the company's management had been "authorized ... to pursue various financial alternatives to the [December] offer." Finally, the letter stated that the company's directors had authorized a variety of defensive measures, including the commencement of litigation against Burlington and the creation of the preferred stock rights.[11]

Throughout the next two weeks, El Paso's management and advisors intensively explored an array of possible transactions with other companies, including the sale of the entire company and/or a substantial portion of its assets. The record demonstrates that between December 23, 1982 and January 6, 1983, representatives of Merrill Lynch and El Paso management spoke or met with dozens of potential "white knight"[12] acquirors in a concentrated effort to develop better alternatives to the December offer. However, throughout this period, neither El Paso nor its advisors were able to generate a more attractive option to the Burlington bid. Even though Merrill Lynch had concluded that the company's stock was worth more than $24 per share, it was becoming evident that Burlington's $24 offer was possibly the best price that could be obtained for El Paso's shareholders under these circumstances.

Prompted by El Paso's advisors, and at least one of his fellow directors, Petty met

9. This novel security, issued as an integral part of a Share Purchase Rights Plan, is generally recognized as the first use and forerunner of the contemporary "poison pill" antitakeover device. *See* M. Johnson, *Takeover: The New Wall Street Warriors* 13, 36–37 (1986).

10. El Paso's directors were concerned that Burlington's financing arrangements would prohibit a substantial increase in its investment in El Paso, or would prompt injudicious El Paso asset sales designed to enable Burlington to service its debt.

11. After this information had been sent to El Paso's shareholders, on December 30, 1982 the Attorney General of the State of Texas instituted litigation against Burlington in the United States District Court for the Western District of Texas, seeking to enjoin the proposed transaction on Federal antitrust grounds.

12. In corporation law parlance, a "white knight" is a friendly alternative partner who rescues the target company from the purported clutches of a hostile bidder. *See* R. Hamilton, *Fundamentals of Modern Business* 604 (1989); L. Solomon, D. Schwartz, J. Bauman, *Corporations: Law & Policy* 332 (Supp.1986).

privately with Bressler in early January, 1983, to discuss generally the troublesome aspects of the December offer. Petty thereupon informed Bressler that although El Paso was dismayed by the sudden and clandestine manner of the Burlington bid, it was not necessarily "averse to having substantial ownership [of El Paso] in other hands" and was "open to further suggestions" from Burlington. Petty reiterated El Paso's publicized concerns with the price and structure of the December offer, and stated that El Paso needed an infusion of additional equity capital. Bressler flatly replied that Burlington was unprepared to improve its offering price or to increase the number of shares covered by the December offer. However, Bressler stated that he appreciated El Paso's non-price concerns and that Burlington was willing to address and negotiate other outstanding matters regarding its offer. The talks ended after less than an hour without making any real progress towards resolving El Paso's deepening dilemma.

On January 7, 1983, the El Paso board reconvened at another special meeting "to receive oral reports from [El Paso's] advisors concerning the various aspects of" the December offer.[13] After reviewing the details of their "white knight" search, Merrill Lynch advised that it would be difficult to produce a superior business combination for El Paso's shareholders in the near future. The pessimistic outlook caused by this report was undoubtedly compounded by the presentation of the board's legal counsel, who outlined El Paso's unsuccessful litigation effort to defuse Burlington's acquisition campaign. Finally, Petty related the details of his unproductive meeting with Bressler, including the latter's apparent refusal to increase the price of Burlington's offer.

El Paso's directors then generally discussed their continuing apprehension that Burlington's December offer did not adequately protect or equally treat all Burlington shareholders. Yet the minutes of this meeting are noteworthy in that the price of the December offer no longer seemed the preeminent concern of the El Paso directors. These minutes clearly support the Vice Chancellor's finding that:

> In these circumstances, everyone recognized that it was inevitable that Burlington would acquire control of El Paso unless an alternative could quickly be found. As to the price, it was apparent that the Burlington offer was the highest price likely attainable.... The critical issue was whether in the remaining few days, El Paso could achieve greater protection for its shareholders either by developing an alternative transaction or by negotiating with Burlington.

*Gilbert II,* slip op. at 8–9. The minutes also confirm that El Paso's directors were highly cognizant of the approaching January 12, 1983 withdrawal deadline under the December offer, and that they would soon be powerless to protect the company's shareholders. The board therefore decided to initiate discussions with Burlington to determine whether the perceived infirmities of the December offer could be ameliorated. Nevertheless, the directors reaffirmed their prior rejection of the December offer as being unfair and inadequate. They further directed the company's advisors to continue to pursue any avenues that might offer superior protections and greater value for El Paso's shareholders.

Shortly after the board meeting, Petty called Bressler to arrange a conference at a hotel in Seattle [14] for the following day—Saturday, January 8, 1983. Petty and Richard Morris later travelled to Seattle, where they met with Bressler and Thomas O'Leary, Burlington's Vice Chairman, during the late afternoon of January 8th. Petty opened the meeting by stating that El Paso wished to remain independent and that the company was continuing to explore all viable alternatives to the Burlington offer. Petty then reiterated El Paso's dissatisfaction with the principal deficien-

---

**13.** Significantly, as of the date of this meeting, no El Paso directors had—or ever did—tender their own shares into Burlington's December offer.

**14.** Burlington maintains its corporate headquarters in Seattle.

cies of Burlington's December offer, including its price, and stated his belief that all El Paso shareholders should have the opportunity to participate in any improved transaction that might be negotiated with Burlington. Petty also repeated that El Paso was hindered by its weak capital structure and required an infusion of equity "to strengthen the company's balance sheet."

In response, Bressler reasserted that Burlington was willing to address any of El Paso's concerns other than the price of its offer, which was non-negotiable. Moreover, Bressler emphasized Burlington's resolve to gain control of El Paso, and expressed his hope that this could be done without El Paso's use of tactics which Burlington perceived as destructive and unnecessary, such as engaging in major asset sales or triggering the preferred share rights or the golden parachutes. However, Bressler concurred with Petty's assessment of El Paso's capital requirements and stated that Burlington was prepared to make a significant equity contribution to El Paso in connection with its bid. Bressler also expressed sympathy for El Paso's desire to gain protections for any back-end minority shares, and indicated a willingness to make a new tender offer open to all El Paso shareholders. After agreeing to keep their lines of communication open, Petty replied that El Paso would consider these matters, and terminated the brief meeting.

Immediately afterwards, Petty and Morris conferred with El Paso's legal advisors to formulate a response to Burlington's tenuous offer to renegotiate its bid. The discussions focused not only upon the pending closing of the now oversubscribed December offer, but also considered the implications of El Paso's failure to attract a superior alternative to Burlington's proposal. In light of El Paso's demonstrated

inability to mount a viable legal defense to Burlington's bid, the group eventually conceded that Burlington, in any case, would probably gain control of the company. Therefore, it was decided that El Paso should engage Burlington in substantive negotiations to obtain improved protections from Burlington for the company's shareholders.[15]

Throughout the weekend of January 8th and 9th, the parties' financial and legal advisors negotiated the essential components of a possible accord between the companies. Central to these negotiations was the amount which Burlington would ultimately invest in El Paso. Despite the apparent urging of El Paso's representatives, Burlington steadfastly refused to increase its front-end offer beyond the minimal amount required under its December offer to gain control of El Paso—approximately $600,000,000. Therefore, in order to reconcile these conflicting points with both companies' desire to augment El Paso's capital structure, the parties agreed in principle to Burlington's acquisition of a majority of El Paso's common stock through a consensual, two-part transaction. Under this proposal, Burlington was granted an option to purchase 4,166,667 treasury shares directly from El Paso for $100,000,-000. These funds would then be used to increase El Paso's equity base. Burlington would then terminate the December offer, and would substitute in its place a new offer (the January offer), for a reduced total of 21,000,000 shares at $24 per share,[16] which would then be open to all El Paso shareholders. Notably, in addition to enhancing the equity base of the company, this arrangement satisfied El Paso's objective that all shareholders should benefit from an improved Burlington offer.

As part of this accord, Burlington agreed in principle to El Paso's demand for en-

---

**15.** Similarly, Bressler and O'Leary had concluded from these talks that a settlement could be achieved, and had authorized their advisors to enter into negotiations with El Paso.

**16.** It appears that the number of shares to be purchased by Burlington under the January offer was established after Burlington had agreed to directly invest $100,000,000 in El Paso. The

record suggests that the parties worked backwards from Burlington's total investment ceiling of $600,000,000, and determined that the remaining $500,000,000 available for Burlington's acquisition effort could be used to purchase approximately 21,000,000 El Paso shares at $24 per share.

hanced procedural safeguards and protections for El Paso's remaining back-end shareholders. Burlington also agreed that Petty and four other El Paso representatives would continue as directors of El Paso ("the Continuing Directors"). Finally, Burlington acknowledged that any contemplated second-step for El Paso's remaining minority shares would be subject to the majority approvals of both the Continuing Directors and El Paso's minority (i.e., non-Burlington) shareholders.[17]

Thereafter, on the morning of January 9th, Petty and Bressler met to discuss and finalize the rough outlines of the settlement agreement drawn up by their advisors. The two chief executives reviewed each substantial point of the tentative accord, and agreed on all of its major components, including the structure of the transactions by which Burlington would gain control of El Paso.[18] At the conclusion of this meeting, Petty agreed to recommend the proposal to the El Paso directors.[19]

At a meeting held the next day in New York City at 6:55 a.m., El Paso's board convened, with one director in attendance by telephone, to consider the agreement with Burlington. During this meeting, Petty reviewed the events and discussions which had occurred since the last special meeting of the El Paso board on the previous Friday. He stated his belief that the agreement would provide fairer treatment of, and greater protections for, El Paso's minority shareholders than they would otherwise receive under the December offer. Additionally, Petty noted that as a result of the settlement with Burlington, all of El Paso's shareholders would be able to participate in the January offer, and that the company's financial stability would be significantly enhanced.

Following a more detailed explanation by the board's legal advisors of the substance of the agreement and the settlement documents, the El Paso directors unanimously concluded that the proposed agreement was in the best interests of the company and its shareholders, and it was subsequently approved. Both corporations executed the settlement agreement later that same day, January 10, 1983.

Burlington thereafter terminated its December offer, and on the next day, January 11, 1983, instituted the new January offer for 21,000,000 shares at $24 per share. In response to the January offer, 40,246,853 shares were tendered, including most of the shares owned by El Paso's directors.[20]

Later, in August of 1983, Burlington proposed to acquire the balance of El Paso's common stock in an all-cash transaction at $24 per share. El Paso's board, including the Continuing Directors, unanimously endorsed this proposed second-step transaction to the company's shareholders, and the formal merger of the corporations was approved by the El Paso and Burlington boards on September 19, 1983. A majority of El Paso's minority, non-Burlington shareholders, approved the merger on December 13, 1983, and Burlington completed its acquisition of the remaining El Paso minority shares on the same day.

## II.

Plaintiffs primarily challenge two aspects of the settlement agreement between

17. Additionally, El Paso granted irrevocable five-year options to Burlington that effectively guaranteed Burlington's ability to maintain its percentage ownership of El Paso's shares at 50.1%.

18. The major items negotiated between Petty and Bressler involved what Bressler termed "the kind of small nits that ... had to do with the [grant of the 'golden parachute'] employment agreements and things of that sort." It appears that Bressler was primarily offended by the fact that Burlington would have to pay Merrill Lynch's advisory fee; as characterized by Petty, Bressler had found that Merrill, Lynch "had done nothing to earn a fee" because it had failed

to produce "successful alternatives" to the Burlington bid and because its "advice had proven unsound".

19. El Paso's directors, many of whom had been in close contact with Bressler during the weekend negotiations, had been forewarned that there would be a special meeting of the board in Wachtell, Lipton's New York office on Monday morning, January 10th.

20. Although 40,246,853 common shares were tendered to Burlington, it ultimately only purchased, on a prorated basis, the 21,000,000 shares which it had agreed to acquire in the first-step transaction.

Burlington and El Paso: the substitution of the January offer for the December offer, and the direct purchase by Burlington of 4,166,667 treasury shares from El Paso. Plaintiffs claim, without dispute from the defendants, that those transactions (i) reduced the number of shares that Burlington directly purchased from El Paso's shareholders and (ii) diluted the proration pool initially established under the December offer by allowing *all* shareholders, including those who were not members of the class, to tender into the January offer.

Plaintiffs also contend that El Paso's directors approved the settlement agreement primarily to enable themselves to tender their own common shares into the January offer, and that such faithlessness and self-dealing is incompatible with the board's fiduciary duty of loyalty to El Paso's shareholders. Thus, plaintiffs claim that the directors of El Paso advanced their own interests to the detriment of the class,[21] and tortiously interfered with the ability of that class to have their shares purchased in the December offer. Plaintiffs further contend that Burlington knowingly conspired in and aided this termination of the class' favorable proration percentage established under the December offer, and that as a matter of law Burlington wrongfully terminated and breached its contractual obligation to complete the December offer.

In 1984 Burlington separately moved to dismiss, or for summary judgment on, all claims brought against it by plaintiffs. Burlington asserted that as a tender offeror pursuing its own economic interest, it owed no fiduciary duty to the plaintiffs,

who were shareholders of the target company, El Paso. Furthermore, Burlington argued that the December offer was expressly made subject to a variety of conditions and that it was entitled to revoke the offer whenever any of them occurred. Finally, Burlington claimed that as a matter of law it could not be held liable for an alleged conspiracy which arose from the negotiations leading to the termination of the December offer. *See Gilbert I,* 490 A.2d at 1052–53.

While denying summary judgment to Burlington on the conspiracy charge,[22] the Court of Chancery agreed that under the circumstances Burlington was entitled to summary judgment on all other claims made against it. The court found that plaintiffs were on clear notice as to the conditions imposed upon the December offer, and observed that several of these specified conditions had preceded Burlington's revocation of its offer. Therefore, the court held that Burlington had reserved the right to terminate the December offer upon the occurrence of any express condition subsequent, and that "no fixed legal relationship arose [with the plaintiffs] as long as Burlington was entitled to withdraw its offer." *Gilbert I,* 490 A.2d at 1055–56. The trial court also granted Burlington's motion for summary judgment on the plaintiffs' "breach of duty" claim, finding that Burlington, as a hostile tender offeror holding only 1% of El Paso's shares, exercised no actual control over El Paso's corporate affairs and therefore, could not owe any direct fiduciary duty to El Paso's shareholders. *Id.* at 1056.[23]

---

**21.** As the El Paso directors had not tendered their shares to Burlington before the December proration period had expired, plaintiffs maintain that El Paso's directors had a significant economic motive to replace the December offer with a subsequent offer (which would establish a new proration period).

**22.** In denying Burlington's motion on the conspiracy allegation, the Vice Chancellor merely found that Burlington was unable to demonstrate that the plaintiffs could not prevail under any provable facts, or that the facts were undisputed and that Burlington was entitled to relief as a matter of law. *See Gilbert I,* 490 A.2d at 1053, 1056–58. Therefore, the trial court's re-

fusal to grant Burlington's 1984 motion for summary judgment was primarily based upon procedural, rather than substantive, grounds. However, the trial court also speculated that Burlington could be held liable if plaintiffs later demonstrated that Burlington knowingly participated in a breach of El Paso's fiduciary duty to its shareholders. *Id.* at 1057.

**23.** The trial court also granted Burlington's motion for summary judgment on plaintiffs' allegation that the defendants tortiously interfered with a contractual business relationship; however, plaintiffs have not raised this issue on appeal.

Thereafter, in 1988, all defendants moved to dismiss, or for summary judgment on, the plaintiffs' remaining claims, including the charge that the defendants entered into a self-dealing conspiracy by negotiating the termination of the December offer. Contending that the · challenged settlement agreement provided enhanced protections for El Paso's shareholders and provided a necessary infusion of equity capital into the company, defendants argued that the decision to approve the settlement should be protected under the traditional business judgment rule analysis.[24] Plaintiffs cross-moved for summary judgment, asserting that under the enhanced *Unocal* standard of review, the actions of the defendants were clearly unreasonable in response to any potential threat posed by the consummation of the December offer. Additionally, the plaintiffs' cross-motion addressed the measure and amount of damages sustained by the class.

The Vice Chancellor concluded at the outset of *Gilbert II* that *Unocal* had no applicability to the challenged actions of the defendants. Instead, the Vice Chancellor applied only the business judgment rule as articulated by us in *Aronson v. Lewis*, Del. Supr., 473 A.2d 805, 812 (1984). *See Gilbert II*, slip op. at 16–20.

The court then examined whether the class possessed any contractual right to the proration percentages established under the December offer. While resisting the plaintiffs' claim that the class had a vested right to their December proration percentages, the court found that the El Paso directors had "an absolute duty not to interfere with the proration interests of the class for an improper or selfish purpose." *Gilbert II*, slip op. at 25.[25] Therefore, the Vice Chancellor ruled that the class plaintiffs' interest in their December proration arrangements could be protected only upon a finding that the El Paso directors were improperly motivated by self-interest in negotiating the termination of the December offer.

Thereafter, the trial court reviewed the record for evidence which might sustain the plaintiffs' assertion that El Paso's directors were motivated by improper concerns. The court found "[n]othing of record" to impeach the defendants' claim that "[a]t the time ... El Paso's directors were actively opposing Burlington, they had valid reasons for believing that the December offer was for an inadequate price and lacked 'back-end' protections." *Gilbert II*, slip op. at 32. Additionally, the Vice Chancellor found the plaintiffs' claims to be contrary to the weight of the evidence, and held that the record established that any personal benefit to the directors was an "incidental, secondary consideration, and not the primary motivation for their actions." *Id.* at 33.. The trial court concluded that El Paso's directors "acted in the honest, good faith belief" that the corporation and all of its shareholders would benefit as a result of the settlement agreement with Burlington, and that their actions must be upheld as a valid exercise of business judgment. *Id.* at 34. Having found that the plaintiffs failed to establish any wrongdoing or any violation of a fiduciary duty owed to the class, the trial court granted summary judgment to the defendants on all remaining issues.

### III.

On appeal from a decision granting summary judgment, our scope of review is *de novo*. *Bershad v. Curtiss–Wright Corp.*, Del.Supr., 535 A.2d 840, 844

---

**24.** This traditional analysis connotes the Court's standard of judicial review under the business judgment rule. *See Polk v. Good,* Del.Supr., 507 A.2d 531 (1986); *Smith v. Van Gorkom,* Del. Supr., 488 A.2d 858 (1985); *Pogostin v. Rice,* Del.Supr., 480 A.2d 619 (1985); *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984); *Zapata Corp. v. Maldonado,* Del.Supr., 430 A.2d 779 (1981). This is in contradistinction to the enhanced business judgment analysis first established by us in *Unocal.*

**25.** The Vice Chancellor relied upon his earlier decision in *Eisenberg v. Chicago Milwaukee Corp.,* Del.Ch., 537 A.2d 1051, 1062 (1987), in which he found that corporate directors have a duty to safeguard the particular interests of a stockholder subclass, so long as these interests are consistent with those of the company and its other shareholders.

(1987); *Fiduciary Trust Co. v. Fiduciary Trust Co.*, Del.Supr., 445 A.2d 927, 930 (1982). We review not only the trial court's opinion but also the entire record, including the pleadings, depositions, and other evidence appearing in the record. *Bershad*, 535 A.2d at 844. We treat all facts in the light most favorable to the non-moving party, and draw our own conclusions with respect to the facts only if the findings of the trial court are clearly wrong. *Id.* If there is no dispute as to material facts, the matter is ripe for summary judgment. *Id.; Fiduciary Trust Co.*, 445 A.2d at 930; *Alexander Indus. Inc. v. Hill*, Del.Supr., 211 A.2d 917, 917 (1965). To the extent the issues on appeal are matters of law, we decide whether the Vice Chancellor erred in formulating or applying legal precepts. *Delaware Alcoholic Beverage Wholesalers, Inc. v. Ayers*, Del.Supr., 504 A.2d 1077, 1081 (1986). *See also Rohner v. Niemann*, Del.Supr., 380 A.2d 549, 552 (1977).

 We first address the Court of Chancery's decision in *Gilbert I* dismissing the breach of contract allegations against Burlington. The court noted that "[p]laintiffs' principal complaint is that Burlington breached its contractual obligation to complete its December tender offer." *Gilbert I*, 490 A.2d at 1054. As characterized, the plaintiffs' breach of contract claim is fundamentally dependent upon their assertion that the class had a recognizable, vested and defendable right to have their shares purchased under the December offer. The plaintiffs' action for contractual breach is contingent upon their presumption that, by tendering their shares into Burlington's highly conditional December offer, the class was vested with certain rights with which neither Burlington nor El Paso could interfere.

It is undisputed that Burlington had conditioned its acceptance of shares tendered into the December offer upon the non-occurrence of a number of specified events, and that *each* of these conditions occurred in the three weeks following the announcement of Burlington's December offer. *See Gilbert I*, 490 A.2d at 1053. It is also well settled that under general contract law an offeror may condition the performance contemplated in his offer upon the occurrence or non-occurrence of specific events. Such conditions may effectively limit the obligation of the promisor to perform. 3A A. Corbin, *Corbin on Contracts* § 639 (1960). Under New Jersey law,[26] an offeror has wide latitude over the terms of its offer and is free to engraft any number of conditions or terms upon it. *See State Farm Mut. Auto. Ins. Co. v. Anderson*, 70 N.J.Super. 520, 176 A.2d 23, 27 (1961); *Joyce v. Stafford*, 72 N.J.Super. 596, 179 A.2d 86, 91 (1962), *aff'd*, 78 N.J.Super. 256, 188 A.2d 310 (1963). Similarly, in connection with a tender offer, an offeror may specify any number of conditions qualifying its obligation to perform, subject to Securities and Exchange Commission limitations and the requirements established under the Williams Act. *See Indiana Nat'l Bank v. Mobil Oil Corp.*, 578 F.2d 180, 185 (7th Cir.1978); *Kroeze v. Chloride Group, Ltd.*, 572 F.2d 1099, 1105 (5th Cir. 1978). *See also TW Servs. v. SWT Acquisition Corp.*, Del.Ch., C.A. No. 10298, Allen, C., 1989 WL 20290 (March 2, 1989). These fundamental principles are clear and are apparently uncontested by the plaintiffs.

 Among their ancillary contractual claims,[27] however, plaintiffs argue that Burlington deliberately invoked these conditions solely to acquire El Paso on more

---

**26.** The December offer provided for performance (the tender of shares) in Newark, New Jersey. The parties agree that New Jersey law controls the plaintiffs' breach of contract claim. The Vice Chancellor correctly found that New Jersey statutory and case law on this issue is consistent with general principles of contract law.

**27.** The plaintiffs also claim that the case of *Field v. Trump*, 850 F.2d 938 (2nd Cir.1988), *cert.*

*denied*, —— U.S. ——, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989), is directly analogous and that its rationale should control this dispute. We find the facts of that case clearly distinguishable from these. *Field v. Trump* does not appear to deal with contractual issues, but rather holds that all corporate shareholders are entitled to non-discriminatory treatment under the Williams Act. The plaintiffs' reliance on *Field v. Trump*, therefore, is clearly misplaced.

advantageous terms, and in so doing, breached its implied covenant of good faith and fair dealing with the class. Although an implied covenant of good faith and honest conduct exists in every contract, *Onderdonk v. Presbyterian Homes of New Jersey*, 85 N.J. 171, 425 A.2d 1057, 1062 (1981), such subjective standards cannot override the literal terms of an agreement.

As part of the December offer, Burlington expressly reserved the right to terminate the offer upon the occurrence of a number of objective, factual events over which Burlington exercised no discretion or control. Although an implied covenant of good faith may preclude an offeror from escaping its obligations by deliberately causing the occurrence of a condition precedent, there is no evidence of such activity here. We agree with the Vice Chancellor's finding that an offeror "is free to pursue its economic interests through the application of conditions intended to limit the cost of proceeding." *Gilbert I*, 490 A.2d at 1055. In tendering their shares to Burlington, the class accepted these express limitations and qualifications, and acknowledged that Burlington could be relieved of its promise to perform upon the occurrence of any of the reserved conditions. Thus, Burlington's mere exercise of its contractual right to terminate its tender offer, without more, does not constitute a breach of its implied covenant of good faith and fair dealing. *See Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 957 (5th Cir.), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981).

### IV.

■ We turn to *Gilbert II*, where the Court of Chancery dismissed the remaining counts against all defendants. The Vice Chancellor concluded that the settlement agreement was "part of an overall rapproachement [sic] between Burlington and El Paso," and that the actions of the El Paso directors "cannot properly be regarded as antitakeover defense measures that would trigger the enhanced judicial scruti-

ny mandated by *Unocal*." *Gilbert II*, slip op. at 17. In rejecting plaintiffs' argument that *Unocal* should govern the actions of the El Paso board, the trial court characterized the enhanced *Unocal* standard as prescribing "the standard for evaluating the conduct of directors adopting antitakeover measures to defend against a threat to the corporate enterprise resulting from a potential change of control." *Id.* at 16–17. The court thus settled upon the business judgment rule—ostensibly by default—as the appropriate standard of review in assessing the conduct of El Paso's directors.

In our opinion the failure to apply *Unocal* in *Gilbert II* was erroneous. When evaluating the probability of success of plaintiffs' claim, the enhanced *Unocal* standard clearly was applicable. Given the Vice Chancellor's finding that El Paso had adopted and conducted a defensive strategy against an attempted takeover, the negotiations by which El Paso's directors successfully extracted material concessions from Burlington constituted a protective response to a potential perceived harm of the type contemplated by *Unocal*. Under these circumstances, the board clearly remained subject to *Unocal*'s enhanced duties. *See Macmillan*, 559 A.2d at 1287; *Revlon*, 506 A.2d at 184.

We recently addressed a somewhat similar application of *Unocal* in *Paramount Communications, Inc. v. Time, Inc.* There, Paramount sought to enjoin a long planned business combination[28] between Time and Warner Communications, so that Paramount could then pursue its tender offer to Time shareholders made on the eve of the Time–Warner transaction. It was a condition of Paramount's offer that the Time–Warner merger agreement be terminated, but Time refused to do so. The Court of Chancery, applying traditional business judgment concepts and not the enhanced duties under *Unocal*, ruled that Time was under no duty to abrogate its well-established business plans to accommodate the demands of a tender offeror. The business combination itself, which long

---

**28.** The original merger agreement between Time and Warner contemplated an exchange of shares rather than an outright purchase of assets or stock.

pre-dated the Paramount bid, was not a defensive measure in response to Paramount's actions. Accordingly, the transaction was not subject to *Unocal*'s enhanced judicial scrutiny. When the form of the transaction later changed in response to Paramount's bid, the Court of Chancery then applied *Unocal* to the altered arrangement. We affirmed those principles.

The law is clear that *Unocal* is invoked as the result of any defensive measures taken in response to some threat to corporate policy and effectiveness which touch upon issues of control. *Unocal*, 493 A.2d at 955. Here, everything that El Paso did was in reaction to Burlington's tender offer. Unlike *Time*, there is no independent transaction having any legal significance which stands apart from the directors' initial efforts to thwart Burlington, or their later attempts to settle with it and attenuate the effects of the takeover. Among those latter efforts were agreements which permitted the directors to tender into the January offer and which, significantly, allowed Petty and four other designees to retain their positions on the El Paso board. Bearing in mind that *Unocal*'s enhanced scrutiny arises from the appearance of certain inherent conflicts attendant to the invocation of defensive measures designed to thwart or impede a takeover, no clearer application of *Unocal* could be conceived than under the circumstances here. *Id.* at 954–55. Thus, the Court of Chancery should have analyzed the facts to determine whether the directors' actions were "motivated by a good faith concern for the welfare of the corporation and its stockholders ... free of any fraud or other misconduct", and whether those actions were "reasonable in relation to the threat posed." *Id.* at 955.

#### A.

The Vice Chancellor's conclusion, that El Paso's directors were not defending against a threat to the corporation and its shareholders in approving the settlement agreement, is neither consistent with the record nor with applicable law. The trial court specifically observed that El Paso's board had authorized a variety of defensive measures in direct response to the unfair and inadequate terms of the initial Burlington offer, including a "white knight" search and the commencement of litigation against Burlington. *Gilbert II*, slip op. at 7. The court also found that El Paso had continued to pursue alternatives to a business combination with Burlington, although "everyone recognized [by early January, 1983] that it was inevitable that Burlington would acquire control of El Paso." *Id.* at 8. Additionally, the trial court confirmed that El Paso's directors "had significant reasons to be concerned about the December offer" and that their "acceptance of the [price of the January bid] represented a pragmatic acknowledgment of, and accommodation to, the realities of the marketplace." *Id.* at 28, 29–30. Finally, having noted that "[t]he critical issue was whether ... El Paso could achieve greater protection for its shareholders," *id.* at 9, it is undisputed that El Paso attempted and was able to negotiate a superior transaction for its shareholders than was available under the impending December offer.

In light of these and other findings made by the trial court, it is apparent that the adversarial negotiations which ensued at El Paso's request on January 8, 1983 can only be viewed as the culmination of final efforts to resist Burlington's coercive December offer. Thus, we cannot agree that the settlement between El Paso and Burlington represented a consensual, voluntary adjustment of their grievances. In the face of Burlington's takeover, El Paso's board was anything but a willing partner to the settlement agreement. The settlement cannot be properly characterized as a rapprochement between the parties, but rather as a capitulation by El Paso on the most favorable terms that it could muster.

Moreover, since the challenged transaction had the undisputed effect of benefitting El Paso's directors to the detriment of the class plaintiffs, there inevitably exists the "omnipresent specter that the board may have acted primarily in its own interests, rather than those of the company and its shareholders." *Unocal*,

493 A.2d at 954. When reviewing actions with such potential for conflict and fiduciary misconduct, this Court requires directors to demonstrate good faith and reasonable investigation before enjoying the presumption of the business judgment rule. *See Ivanhoe Partners v. Newmont Mining Corp.*, Del.Supr., 535 A.2d 1334, 1341–42 (1987); *Revlon*, 506 A.2d at 180–81, 184; *Unocal*, 493 A.2d at 954–956. Considering all those factors, the decision by El Paso's directors to negotiate and approve the settlement agreement with Burlington must be evaluated in light of *Unocal*'s enhanced judicial scrutiny. *See Macmillan*, 559 A.2d at 1287–88; *Unocal*, 493 A.2d at 954–956.

### B.

In reviewing plaintiffs' claims, we must first analyze the nature of the December offer to determine whether it endangered the interests of El Paso and its shareholders. We have repeatedly recognized the coercive nature of two-tier, partial tender offers. *Newmont*, 535 A.2d at 1342; *Unocal*, 493 A.2d at 956. The December offer, which provided neither for a second-step transaction nor any back-end protections for El Paso's remaining minority shareholders, was an archetype of this coercive mechanism. Indeed, the plaintiffs hardly deny the serious threat to the corporation and its shareholders which the December offer posed. Instead, the plaintiffs direct their arguments to the directors' response to the threat posed by Burlington's coercive bid. They claim that the El Paso directors negotiated and approved the settlement agreement primarily out of their own self-interest to permit the tender of their own shares into the January offer. The plaintiffs claim that such improperly motivated acts do not survive the second part of *Unocal*'s enhanced scrutiny, and are clearly unreasonable as a response to a takeover threat. Plaintiffs further contend that the directors engaged in a self-dealing

transaction that was detrimental to the plaintiff class by renegotiating the December offer and tendering their own shares into the January offer. *See Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701 (1983); *Sinclair Oil Corp. v. Levien*, Del.Supr., 280 A.2d 717, 720 (1971); *Cheff v. Mathes*, Del.Supr., 199 A.2d 548, 554 (1964). The defendants reply that *Unocal*'s enhanced scrutiny is not implicated here,[29] and that their actions were a textbook example of how a responsible corporate board should respond to a coercive, two-tiered tender offer. The defendants additionally argue that no evidence in the record supports the plaintiffs' breach of loyalty claim, particularly since the settlement agreement failed to bestow any benefit upon the directors which did not devolve upon all El Paso shareholders. *See Aronson*, 473 A.2d at 812.

In assessing the plaintiffs' allegations, we must evaluate the El Paso directors' overall response to the December offer, including the justification for each challenged defensive measure, and the results achieved thereby. *See, e.g., Newmont*, 535 A.2d at 1343. Since all of the directors' actions here are so inextricably related, it is now well established law that the principles of *Unocal* require that such actions "be scrutinized collectively as a unitary response to the perceived threats" posed by Burlington. *Id.* In the absence of some independent transaction with legal significance other than as a response to Burlington's December offer, an application of *Unocal* to any decision to act or refrain from acting was clearly mandated. Thus, we must consider the challenged defensive measures, including the directors' initial response to Burlington's bid, their subsequent decision to sell the company, and their negotiation of a new, more favorable offer to all El Paso shareholders.

---

**29.** In arguing against the application of the *Unocal* standard to these circumstances, defendants apparently fear that the conduct of the El Paso board might somehow wither under enhanced judicial scrutiny. Like the traditional business judgment analysis, however, *Unocal* also implic-

itly acknowledges that courts should not impose their own business judgment upon independent directors who reasonably respond to a threat to the corporate enterprise in good faith and on an informed basis. *See Time*, slip op. at 36.

The reasonableness of the defensive measures adopted by the El Paso board is facially apparent from the record. Two days after the announcement of the December offer, the El Paso board met with their investment bankers and lawyers to conduct a detailed review of the December offer and its effects on the company and its shareholders. Supported by the opinion of their advisors, the directors found that the bid threatened the corporate enterprise. Their prompt adoption of defensive measures in an attempt to meet this imminent threat was hardly improvident. Given the injunction of *Unocal* that the duties of care and loyalty prevent a board from being a passive instrumentality in the face of a perceived threat to corporate control, one would have expected nothing less from the directors under the circumstances. *Newmont*, 535 A.2d at 1342–46; *Unocal*, 493 A.2d at 955; *Van Gorkom*, 488 A.2d at 872; *Pogostin*, 480 A.2d at 627. Additionally, the board authorized an exhaustive investigation seeking a better option for El Paso's shareholders.

The record indicates that by the special board meeting of January 7, 1983, the situation faced by the El Paso directors was materially changed. With only days remaining before the December offer would be successfully completed, it had become apparent that the breakup of the company was inevitable. Thus, it was incumbent upon the El Paso board to seek the best transaction and maximum value reasonably attainable under the circumstances. *Macmillan*, 559 A.2d at 1288; *Revlon*, 506 A.2d at 182. This change in focus, however, did not alter the Board's continued duties of care and loyalty under *Unocal*. *Macmillan*, 559 A.2d at 1287.

Having reasonably determined that Burlington's price of $24 was the highest price likely obtainable for the company, one cannot say that the board acted improperly by entering into negotiations which materially enhanced the structural protections afforded El Paso's stockholders. Even the plaintiffs concede that the January offer provided substantial improvements in the terms extended to all shareholders. In sum, the record attests to the diligence of the El Paso board, and suggests that the directors fulfilled their fiduciary duties of care and loyalty to the company and its shareholders. *Contrast Macmillan*, 559 A.2d at 1280–82, 1282–84; *Van Gorkom*, 488 A.2d at 873–88.

As to the plaintiffs' contention that self-dealing can be inferred from the El Paso directors' role in arranging the January offer, into which the board could tender their own El Paso shares, it is undisputed that El Paso's directors did not stand on both sides of the transaction. *Compare Aronson*, 473 A.2d at 812. By tendering into the January offer, no board member received any special benefit which was not also extended to all shareholders. *See Unocal*, 493 A.2d at 958. *Cf. Sinclair Oil Corp.*, 280 A.2d at 720–22. Conceivably, the retention of five El Paso directors on the board, after Burlington assumed control of the company, suggests self-interest and a motive for entrenchment. However, there is not a scintilla of evidence to intimate that this arrangement was the result of improper motives.

If anything, the record suggests that the directors had an abiding concern for El Paso's shareholders, who remained subject to a backend, freezeout merger. Their presence on the new board assured that the interests of these minority stockholders would continue to be represented. Without more, the mere fact that one is elected by a controlling shareholder is not an indicia of faithlessness. *Aronson*, 473 A.2d at 816. As we said in *Aronson:*

> [I]t is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director. It is the care, attention and sense of individual responsibility to the performance of one's duties, not the method of election, that generally touches on independence.

*Id.*

Moreover, the record is devoid of evidence to sustain a charge that the El Paso directors approved the January offer for

the benefit of five of their number, who would remain on the new board consisting of fourteen members. Here, too, the independent judgment and concern for all El Paso shareholders, manifested by the objective acts of the defendants, pervades the record. Again *Aronson* is instructive, and its test is met here:

> The requirement of director independence inheres in the conception and rationale of the business judgment rule. The presumption of propriety that flows from an exercise of business judgment is based in part on this unyielding precept. *Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences....* [T]he end result ... must be that each director has brought his or her own informed business judgment to bear with specificity upon the corporate merits of the issues without regard for or succumbing to influences which convert an otherwise valid business decision into a faithless act.

*Id.* (emphasis added). Thus, under all circumstances, and applying *Unocal's* enhanced standards, we find nothing in the record to alter the ultimate conclusion that the acts of these defendants in all respects meet the foregoing principles of propriety and independence mandated by *Aronson.*

█ With respect to their breach of loyalty claim, the plaintiffs failed to produce any evidence that the El Paso directors were unfaithful or disloyal to corporate and shareholder interests in responding to the Burlington takeover bid.[30] Given this self-admitted failure to produce any credible proof to directly impugn the *bona fides* of the El Paso directors, the plaintiffs have in effect invited this Court to draw an inference of improper motivation from innuendo even though the objective undisputed facts are to the contrary.

█ Generally, a question of subjective motive or intent rarely lends itself to sum-

mary judgment. *See George v. Frank A. Robino, Inc.,* Del.Supr., 334 A.2d 223, 224 (1975); *Continental Oil Co. v. Pauley Petroleum, Inc.,* Del.Supr., 251 A.2d 824, 826 (1969). But here, the plaintiffs were unable to produce any evidence to suggest that the actions of El Paso's directors were motivated by improper or selfish interests. The class plaintiffs have the initial burden of establishing some credible and direct evidence to support their essential allegations in order to defeat defendants' motions for summary judgment. *See Murphy v. Godwin,* Del.Super., 303 A.2d 668, 673 (1973). As the Superior Court stated in *Murphy v. Godwin:*

> If a plaintiff opposing defendant's motion for summary judgment has had fair opportunity to explore the defendant's subjective state of mind and yet cannot point to anything tangible which indicates that the defendant had [culpable intent], plaintiff cannot prevail and the defense motion must be granted.

*Id.* Under these circumstances, something more than innuendo is required to justify an inference of wrongful intent on the part of the defendants. *Id.* In short, plaintiffs failed to present a basis for recovery against defendants, and the trial court properly dismissed their breach of loyalty claim. *Cf. Vanaman v. Milford Memorial Hosp., Inc.,* Del.Supr., 272 A.2d 718, 720 (1970).

█ Finally, we reject plaintiffs' assertion that the actions of the El Paso directors are not entitled to the protections of the business judgment rule because their interests as shareholders indisputably conflicted with the plaintiffs' interests in having their shares accepted under the December offer. In attempting to fulfill their fiduciary duties to the shareholders, directors may have to make difficult decisions involving the competing interests of various shareholder groups. *Unocal,* 493 A.2d at 958. While El Paso's board could not unjustifiably interfere with the plain-

---

30. In their brief, the class plaintiffs implicitly acknowledge the purely circumstantial nature of the evidence underlying their breach of loyalty claim, stating that "[a]bsent the rare instance of a confession, questions of motive can only be determined from the inevitability of the results caused."

tiffs' proration rights, their fiduciary duties as directors required them, under these circumstances, to protect and advance the interests of *all* El Paso's shareholders. While it is true that the non-tendering shareholders, including the directors, had interests opposed to those of the class plaintiffs, under the circumstances it was unavoidable. Any duty owed by El Paso's directors to the plaintiffs had to be considered in light of their duty to the corporation and all its shareholders. *Macmillan,* 559 A.2d at 1285, 1287–88.

The record demonstrates that the decision of the El Paso directors to secure the participation of all El Paso shareholders in any improved Burlington offer was a proper exercise of business judgment. The directors' desire to enable all El Paso shareholders to tender their shares to Burlington—including those shareholders who had resisted the December offer based upon the board's express recommendation—is surely a valid and defensible business decision. We thus reject the argument that the El Paso board was obliged to favor the plaintiffs at the expense of the non-tendering shareholders. The revisions incorporated into the January offer produced increased benefits for El Paso and *all* its shareholders. There can be no culpability arising from such justifiable and warranted action. *Cf. Freedman v. Restaurant Associates. Indus. Inc.,* Del.Ch., C.A. No. 9212, Allen, C., 1987 WL 14323 (October 16, 1987).

## V.

 In conclusion, we find that Burlington had reserved the right and was entitled to terminate its December offer upon the occurrence of any of the express conditions in its offer. Such action did not infringe upon any contractual rights of the class plaintiffs. Further, we agree with the trial court's finding that Burlington owed no direct fiduciary duties to El Paso's shareholders, including the plaintiffs.

 With respect to the directors' approval of the challenged settlement agreement with Burlington, there is no question that the directors of El Paso acted properly and in fulfillment of their fiduciary duties to the corporation and all shareholders. The December offer clearly posed a certain and identifiable threat to the corporate enterprise, and the defensive measures adopted by El Paso were a balanced and reasonable response to the threat posed. When the sale of El Paso became inevitable, the El Paso board properly attempted to obtain the highest price and best transaction for the company and all its shareholders. Their actions survive the enhanced *Unocal* scrutiny. Moreover, the plaintiffs have failed to produce any credible evidence to support their claim of a disqualifying self-interest. Absent evidence that a board breached its fiduciary duties, we will not substitute our judgment for that of the directors. *Macmillan,* 559 A.2d at 1288.

Accordingly, the judgments of the Court of Chancery in *Gilbert I* and *Gilbert II* are AFFIRMED.